WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel:     (415) 496-6723
Fax:    (415) 636-9251

*Attorneys for Debtor-Appellees (Debtors and Debtors in Possession)*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Appellees.<br><br>ANTHONY GANTNER, individually and on behalf of all those similarly situated,<br><br>Appellants,<br><br>v.<br><br>PG&E CORPORATION, a California Corporation, and  PACIFIC GAS & ELECTRIC COMPANY, a California Corporation,<br><br>Appellees. | Case No. 4:20-cv-02584 (HSG)<br><br>Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>Adv. Pro. No. 19-03061<br><br>**APPELLEES' OPPOSITION BRIEF** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Appellees PG&E Corporation and Pacific Gas and Electric Company state:  PG&E Corporation and Pacific Gas and Electric Company are organized under the laws of California.  PG&E Corporation, a publicly held corporation, owns all of the issued and outstanding common stock of Pacific Gas and Electric Company.  No publicly held corporation owns 10% or more of PG&E Corporation's stock.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     STANDARD OF REVIEW ..................................................................................3

III.    BACKGROUND ...................................................................................................3

IV.    PROCEDURAL HISTORY...................................................................................8

V.     THE BANKRUPTCY COURT'S ORDER DISMISSING THE COMPLAINT
        SHOULD BE AFFIRMED ...................................................................................9

        A.      The Bankruptcy Court Properly Ruled That PUC § 1759 Preempts Plaintiff's
                Complaint.................................................................................................9

        B.      The Bankruptcy Court Correctly Found That the Complaint Failed to Allege
                Causation................................................................................................17

        C.      The Bankruptcy Court Order Should Be Affirmed on the Alternative Ground
                That PG&E's Tariff Rule 14 Allows It to Shut Off Power for Public Safety
                Without Liability to Customers ...........................................................21

        D.      The Bankruptcy Court Did Not Abuse Its Discretion by Not Granting Plaintiff
                Leave to Amend the Complaint ...........................................................24

VI.    CONCLUSION....................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AE ex rel. Hernandez v. Cty. of Tulare,*
666 F.3d 631 (9th Cir. 2012) ...................................................................................24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).........................................................................................17, 18

*Cervantes v. Countrywide Home Loans, Inc.,*
656 F.3d 1034 (9th Cir. 2011) ...................................................................................3

*Cockhren v. Pac. Gas & Elec. Co.,*
No. CGC-13-529137, 2014 WL 5601354 (Cal. Super. Ct. Oct. 7, 2014) ...................23

*Cooney v. Cal. Pub. Utils. Comm'n,*
No. C 12-6466 CW, 2014 WL 3531270 (N.D. Cal. July 15, 2014) .................10, 12, 16

*Corrie v. Caterpillar, Inc.,*
503 F.3d 974 (9th Cir. 2007) .....................................................................................3

*Cundiff v. GTE Cal. Inc.,*
101 Cal. App. 4th 1395 (2002) ..................................................................................15

*Dollar-A-Day Rent-A-Car Sys. v. Pac. Tel. & Tel. Co.,*
26 Cal. App. 3d 454 (1972) .......................................................................................22

*Duggal v. G.E. Capital Commc'ns Servs.,*
81 Cal. App. 4th 81 (2000) .......................................................................................22

*Dyke Water Co. v. Pub. Utils. Comm'n,*
56 Cal. 2d 105 (1961) ..............................................................................................22

*El Pollo Loco, Inc. v. Hashim,*
316 F.3d 1032 (9th Cir. 2003) ..................................................................................21

*Hartwell Corp. v. Superior Court,*
27 Cal. 4th 256 (2002) ...............................................................................11, 12, 16

*In re Gens,*
No. 15-BK-53562, 2018 WL 4353086 (N.D. Cal. Sept. 12, 2018) ........................21, 24

*In re Jones,*
657 F.3d 921 (9th Cir. 2011) ...............................................................................21, 24

*In re Tracht Gut, LLC,*
503 B.R. 804 (B.A.P. 9th Cir. 2014)...........................................................................24

*In re Turbodyne Techs., Inc. Sec. Litig.,*
No. CV9900697MMMBQRX, 2000 WL 33961193 (C.D. Cal. Mar. 15, 2000)...........19

*Kairy v. SuperShuttle Int'l,*
660 F.3d 1146 (9th Cir. 2011) .............................................................................13, 16

*Mangiaracina v. BNSF Ry. Co.*,
   No. 16-cv-06270-JST, 2019 WL 1975461 (N.D. Cal. Mar. 7, 2019) ........................................16

*Mata v. Pac. Gas & Elec. Co.*,
   224 Cal. App. 4th 309 (2014) ........................................................................................................15

*N. Star Gas Co. v. Pac. Gas & Elec. Co.*,
   No. 15-CV-02575-HSG, 2016 WL 5358590 (N.D. Cal. Sept. 26, 2016)...........................14

*Novak v. Cont'l Tire N. Am.*,
   22 Cal. App. 5th 189 (2018) ..........................................................................................................17

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
   50 F. Supp. 3d 1328 (C.D. Cal. 2014) ........................................................................................19

*PegaStaff v. Pac. Gas & Elec. Co.*,
   239 Cal. App. 4th 1303 (2015) .............................................................................................14, 16

*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*,
   754 F.3d 754 (9th Cir. 2014) ........................................................................................................25

*Rosen v. Uber Techs. Inc.*,
   164 F. Supp. 3d 1165 (N.D. Cal. 2016) .....................................................................................10

*San Diego Gas & Elec. Co. v. Superior Court (Covalt)*,
   13 Cal. 4th 893 (1996) ......................................................................................................... *passim*

*Sanchez v. Cty. of San Bernardino*,
   No. CV 10-09384 MMM, 2014 WL 12734756 (C.D. Cal. Mar. 10, 2014) .................21

*Sarale v. Pac. Gas & Elec. Co.*,
   189 Cal. App. 4th 225 (2010) ........................................................................................................12

*Shriners v. United States*,
   No. 14-CV-1437 AJB (KSC), 2017 WL 3412299 (S.D. Cal. Aug. 8, 2017) .................21

*Tesoro Ref. & Mkt'g Co. v. Pac. Gas & Elec. Co.*,
   146 F. Supp. 3d 1170 (N.D. Cal. 2015) ...............................................................................23, 24

*Waters v. Pac. Tel. Co.*,
   12 Cal. 3d 1 (1974) ..........................................................................................................................14

*Wilson v. S. Cal. Edison Co.*,
   234 Cal. App. 4th 123 (2015) ........................................................................................................15

**Constitutional Provisions, Statutes & Rules**

Cal. Const., art. XII, §§ 1-6..............................................................................................................4

Cal. Pub. Util. Code § 1759 .............................................................................................. *passim*

Cal. Pub. Util. Code § 2106 ...................................................................................................9, 10, 14

Cal. Pub. Util. Code § 8386 .............................................................................................................4, 5

Cal. SB 901, 2018 Leg. (Cal. 2018).............................................................................................5, 18

Fed. R. Civ. P. 12(b)(1)................................................................................................3, 8, 24

Fed. R. Civ. P. 12(b)(6)...................................................................................................17, 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **I.    INTRODUCTION**

2              Multiple grounds exist to affirm the bankruptcy court's order dismissing Plaintiff's

3    complaint.  *First*, in a thorough and well-reasoned decision, the bankruptcy court properly held that

4    Public Utilities Code ("PUC") § 1759 preempts Plaintiff's complaint because the California Public

5    Utilities Commission ("CPUC") authorized the conduct at issue.   *Second*, the bankruptcy court

6    correctly ruled that Plaintiff failed to adequately allege causation, a required element of Plaintiff's

7    claim.  Finally, PG&E's Tariff Rule 14 forecloses Plaintiff's claim.

8              In recent years, the risk of catastrophic wildfires in Northern California has increased

9    dramatically due to climate change.  In particular, as the rainy season in Northern California has shrunk

10   and started increasingly late, it has extended the fire season and exacerbated wildfire risk.  As a result,

11   parts of California (sometimes small pockets, sometimes larger areas) at times experience a mix of

12   conditions that present extreme fire risk:  vegetation dried out by a long dry season, strong Diablo

13   windstorms, and hot, dry weather.  In these areas during these times, a small spark—such as a spark

14   caused by the wind dislodging a branch from one of the tens of millions of trees that surround PG&E's

15   power lines and making contact with a line—can turn into a catastrophic, deadly wildfire.

16             To address this substantial threat, the California legislature, CPUC and California's

17   utilities have worked to establish new tools and programs that mitigate the risk of wildfires caused by

18   electric equipment.   For example, following the devastating Camp Fire, PG&E conducted an

19   unprecedented effort before the 2019 fire season to inspect its transmission, distribution and substation

20   equipment using new, industry-leading inspection methods across the high-fire threat areas in its

21   service territory.  It also has instituted vegetation management programs that exceed the state standards

22   for clearances around power lines in high-fire threat areas.

23             One critical tool that *all* the major utilities in California have implemented and relied

24   on is prospective de-energization of power lines during periods of extreme risk.  Following extensive

25   consideration of the benefits and costs, the CPUC authorized utilities in the state, including PG&E, to

26   implement "Public Safety Power Shutoff" ("PSPS") events in accordance with CPUC-promulgated

27   rules and guidelines.  The CPUC has reviewed and approved PG&E's wildfire mitigation plans setting

28

out PG&E's de-energization protocols. The CPUC maintains oversight of PSPS events implemented by utilities and continues to refine its guidelines based on experience and input from the public.

Through his putative class action, lead plaintiff Antony Gantner ("Plaintiff") seeks to impose billions of dollars in liability for various power shut-offs PG&E undertook in the fall of 2019 to save lives and property. Critically, Plaintiff does *not* allege that PG&E's PSPS events were imprudent, carried out unreasonably or performed in violation of any of the CPUC's guidelines governing power shutoffs. In Plaintiff's own words: "[T]he Complaint does not contend that PG&E should not have implemented the PSPSs at issue, or that it implemented them improperly". (App. Br. at 4.) Instead, Plaintiff seeks to impose liability for every PSPS that PG&E conducted in 2019 and will conduct going forward, and for every affected customer, even while conceding that the CPUC authorized each PSPS event and PG&E carried them out properly.

There are three independent reasons why this action fails as a matter of law. *First*, the court lacks subject matter jurisdiction. The California Legislature, through PUC § 1759, has divested civil courts of jurisdiction over actions that interfere with the CPUC's regulatory authority. The California Supreme Court has made clear that such interference is present where, as here, a plaintiff seeks to impose liability for conduct the CPUC has authorized. Accordingly, the bankruptcy court properly found that PUC § 1759 preempts Plaintiff's action and the court lacks subject matter jurisdiction over Plaintiff's Complaint.

Plaintiff tries to avoid this result by arguing that in the past PG&E did a poor job of maintaining its power lines, and this maintenance failure necessitated the PSPS events. That is a false link. It also is beside the point. The CPUC has authorized PG&E to shut off power in accordance with CPUC requirements when the risk of a catastrophic wildfire is extreme. Accordingly, PUC § 1759 preempts this attempt to impose civil liability for the authorized PSPS events, regardless of what allegations Plaintiff brings forward about *why* the CPUC chose to authorize the conduct.

*Second*, as the bankruptcy court correctly ruled, Plaintiff's effort to impose liability for authorized PSPS events based on poor maintenance efforts in prior years suffers from a clear causation problem. Plaintiff's alleged injuries—such as food spoiled in the refrigerator and distress from being in the dark—were a result of PG&E's PSPS events, and the class is defined to include any person that

had their power shut off by PG&E during the 2019 PSPS events or any future PSPS.  Again, however, Plaintiff does not argue that PG&E improperly carried out those PSPS events that resulted in the alleged injuries.  Instead, Plaintiff argues that PG&E's past negligence necessitated the PSPS events.  But Plaintiff fails to allege any facts connecting that alleged negligence to the PSPS events that took place.  Plaintiff concludes numerous times in the Complaint that the PSPS events were "necessitated" by PG&E's negligent maintenance, but there are no facts alleged, that if proven true, would establish such a link.  Nor could Plaintiff plausibly allege such a link.  The CPUC indisputably has authorized PSPSs on a state-wide basis to deal with extreme fire risk weather, regardless of the underlying maintenance of a particular utility's lines.

*Third*, Plaintiff's allegations fail to state a claim upon which relief may be granted due to PG&E's Tariff Rule 14.  Tariff Rule 14, which governs the relationship between PG&E and its customers and has the force of law, permits PG&E to interrupt service without liability when in its sole opinion doing so is necessary for public safety.  There is no dispute that is exactly what PG&E did with the PSPS events.

## II.   STANDARD OF REVIEW

A lower court's dismissal of an action for lack of subject matter jurisdiction under Rule 12(b)(1) is a question of law and reviewed *de novo*.  *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 (9th Cir. 2007).  The bankruptcy court's decision to deny Plaintiff leave to amend its Complaint is reviewed for abuse of discretion.  *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1040 (9th Cir. 2011).

## III.   BACKGROUND

PG&E's opening motion to dismiss brief explained in detail that PG&E's 2019 PSPS events, at issue in this litigation, occurred as part of a regulatory framework the legislature and the CPUC developed to address the increasing risk of wildfires in California.  (AA0038-47.) A confluence of climate conditions, including increased temperatures, extended periods of drought, bark beetle infestations and unusually high winds have significantly increased the risk that a downed electrical line will cause a catastrophic fire.  The tragic consequences of the 2017 and 2018 Northern California wildfires make clear just how important it is to minimize this risk.  PG&E's

PSPS program was developed to help address this growing threat and, per California law, is subject to the CPUC's approval and supervision.

### A.      The CPUC's Regulation of Prospective De-energization

The CPUC regulates the operation of electric utilities in California, including efforts related to safety and wildfire prevention.  *See* Cal. Const., art. XII, §§ 1-6; *see also* PUC § 8386.  As part of this regulation, the CPUC exercises a supervisory role over utilities' decisions to proactively de-energize their electric lines as a public safety measure.

The CPUC first authorized a public utility to engage in planned PSPSs to reduce the risk of wildfires in April 2012, when it approved SDG&E's application to prospectively de-energize lines in certain high-fire threat conditions in Decision 12-04-024 (the "SDG&E Decision").  (AA0162.)  In making this determination, the CPUC was cognizant of the hardships that power shutoffs bring to communities, residents and businesses, yet nevertheless found that the harms associated with fires sparked by electrical equipment merited such a drastic precautionary measure.  (*See* AA0169-70; *see also* AA0108-10; AA0118-28.)  The CPUC also recognized that even if a system is reasonably maintained, high winds below the design limit can still create a risk to public safety.  (AA0194 ("[T]here is a risk that SDG&E's existing facilities may fail at wind speeds below 91 mph" so "[i]t would be extremely dangerous to prohibit SDG&E from shutting off power when SDG&E reasonably believes there is an imminent danger of energized power lines falling onto tinder dry vegetation in Santa Ana wind conditions and there are no other safety measures available").)

Following the 2017 California wildfire season, which, according to the CPUC, "further demonstrate[d] the fire risk in California", the CPUC adopted ESRB-8, which extended the application of the SDG&E Decision to all investor-owned utilities and enhanced the CPUC's de-energization policies.  (AA0465; AA0466; AA0468.)  The CPUC set forth several factors it may consider when reviewing a utility's decision to de-energize for reasonableness, including whether (1) the decision to shut off power was necessary to protect public safety; (2) the utility relied on alternatives to de-energization, to the extent available; (3) the utility "reasonably believe[d] that there [was] an imminent and significant risk that strong winds will topple its power lines onto tinder dry vegetation or will cause major vegetation-related impacts on its facilities during periods of extreme fire hazard";

(4) the utility considered efforts to mitigate the adverse impacts of de-energization; and (5) other factors, as appropriate. (AA0468.) In addition, ESRB-8 requires that utilities submit a report to the CPUC following PSPSs within 10 business days after each de-energization event, as well as after events where the utility provided notification to local governments, agencies and customers of a possible de-energization. (AA0469.) The CPUC has continued to enhance and refine its PSPS guidelines and requirements through public stakeholder engagement. (*See, e.g.*, AA0499.)

In August 2018, the California legislature passed Senate Bill ("SB") 901 (Dodd), which requires utilities with equipment in areas with significant fire risk to prepare a wildfire mitigation plan which must be reviewed annually by the CPUC. Annual wildfire mitigation plans *must include* "[p]rotocols for . . . deenergizing portions of the electrical distribution system that consider the associated impacts on public safety", as well as "protocols related to mitigating the public safety impacts" of de-energization. PUC § 8386(c)(6). Before approving a utility's wildfire mitigation plan, the CPUC conducts an extensive review process which includes receiving comments from the public, local and state agencies and other interested parties, as well as providing feedback to the utilities. (AA0775; AA0781.)

## B.    PG&E's PSPS Program

PG&E developed its PSPS program in 2018 following the North Bay Wildfires and initiated its first PSPS event in October 2018. In advance of the 2019 wildfire season, and pursuant to SB 901, PG&E filed its 2019 Wildfire Safety Plan with the CPUC in February 2019[1] that included a significant expansion of its PSPS program to include all distribution and transmission lines that cross areas designated by the CPUC as "Tier 2" or "Tier 3" High Fire Threat Districts or HFTDs. (*See* WSP at 96.) Under the plan, PG&E looks to a combination of factors when determining if power should be turned off for safety, including: (a) a Red Flag Warning declared by the National Weather Service; (b) low humidity levels, generally 20 percent and below; (c) forecasted sustained winds generally above 25 miles per hour and wind gusts in excess of approximately 45 mph, depending on location

---

[1] *See* PG&E Amended 2019 Wildfire Safety Plan (Feb. 6, 2019) ("WSP"), cited at AA1113 below, https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Wildfire-Safety-Plan.pdf.

1   and site-specific conditions; (d) computer simulated ignition spread and consequence modeling based

2   on current conditions; (e) conditions of dry fuel on the ground and live vegetation; and

3   (f) on-the-ground, real-time wildfire-related information from PG&E's Wildfire Safety Operations

4   Center and field observations from PG&E field crews.  (WSP at 97-98.)

5          The Wildfire Safety Plan also detailed PG&E's implementation of new and ongoing

6   safety precautions to address the growing threat of extreme weather and wildfires across its service

7   area.  For example, the plan called for PG&E to conduct fundamentally enhanced safety inspections

8   of electric infrastructure in high-fire threat areas in advance of the 2019 fire season.  (*See* WSP at

9   52-60.)

10         The CPUC approved PG&E's Wildfire Safety Plan in Decision 19-05-037, issued on

11  June 4, 2019.  (*See* AA0687.)  PG&E's 2020 wildfire plan, which includes a detailed description of

12  its PSPS program for the 2020 fire season, received conditional approval from the CPUC on June 11,

13  2020.[2]

14         **C.    The 2019 PSPS Events**

15         The Complaint alleges that PG&E executed de-energization events on October 9,

16  October 23, October 26, October 29 and November 20, 2019 (the "2019 PSPS Events").

17  (AA0014-16 at ¶¶ 63-78.)  After these events, PG&E patrols revealed, in total, hundreds of instances

18  where a fire could have been ignited but for de-energization.  (*See* AA0039; AA0898-99.)  Four

19  instances of vegetation damage from the 2019 PSPS events are depicted below.[3]

20

21

22  [2] *See* Wildfire Safety Division Action Statement on PG&E's 2020 Wildfire Mitigation Plan, CPUC
23  (June 11, 2020), at 1, https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M340/K895
    /340895473.PDF

24  [3] The photographs can be found in the following reports submitted to the CPUC and were cited below
25  at AA0039:   PG&E's Amended PSPS Report to the CPUC October 9-12, 2019
    De-Energization Event (Nov. 8, 2019), at Appendix D, https://www.pge.com/pge_global/common
26  /pdfs/safety/emergency-preparedness/natural-disaster/wildfires/PSPS-Report-Letter-10.09.19
27  -amend.pdf; PG&E's PSPS Report to the CPUC October 26 & 29 De-Energization Event (Nov. 18,
    2019),   at   Appendix   C,   https://www.pge.com/pge_global/common/pdfs/safety/emergency
28  -preparedness/natural-disaster/wildfires/PSPS-Report-Letter-10.26.19.pdf.







Since the 2019 PSPS events occurred, the CPUC has initiated two proceedings to review the manner in which the PSPS events were carried out.  For example, in November 2019, the CPUC issued an Order Instituting Investigation "to determine whether California's investor-owned utilities prioritized safety and complied with the Commission's regulations and requirements with respect to their Public Safety Power Shutoff (PSPS) events in late 2019".  (AA0915.)  The CPUC's investigation into the 2019 PSPS events remains ongoing.

1    **IV.   PROCEDURAL HISTORY**

2          **A.    Plaintiff's Complaint**

3                On December 19, 2019, Plaintiff filed his Complaint initiating an adversary proceeding

4    in PG&E's Chapter 11 proceedings, alleging that he and the members of the putative class suffered

5    financial hardships, property damage, loss of earnings and profits and emotional distress as a result of

6    the 2019 PSPS Events.  (AA0021-22 at ¶¶ 99-102.)  Plaintiff sought to certify a class including "[a]ll

7    California residents and business owners who had their power shutoff by PG&E during the

8    [2019 PSPS Events] and any subsequent voluntary Outages PG&E imposes on its customers during

9    the course of litigation".  (AA0018 at ¶ 85.)  Plaintiff demands special and general damages of at least

10   $2.5 billion, injunctive relief, and punitive and exemplary damages.  (AA0023.)

11         **B.    PG&E's Motion to Dismiss and the CPUC's *Amicus* Brief in Support of PG&E**

12               On January 21, 2020, PG&E filed a motion to dismiss Plaintiff's Complaint, including

13   on the ground that the bankruptcy court lacked subject matter jurisdiction to hear the action under

14   Rule 12(b)(1) because PUC § 1759 preempts the action.  (AA0025.)  Plaintiff opposed PG&E's

15   motion.

16               The CPUC submitted an *amicus curiae* brief on March 4, 2020 supporting PG&E's

17   position that Plaintiff's action interferes with the CPUC's authority over the regulation of PSPS events

18   as well as the CPUC's approval of PG&E's 2019 Wildfire Safety Plan and is therefore preempted by

19   PUC § 1759.  (AA1122.)

20               On March 10, 2020, the bankruptcy court held oral argument on PG&E's motion to

21   dismiss.  (AA1179.)  On March 30, 2020, the bankruptcy court issued a memorandum decision

22   granting PG&E's motion to dismiss on the grounds that PUC § 1759 preempted Plaintiff's action.  The

23   court held that litigation of Plaintiff's claim would hinder and interfere with the enforcement of the

24   CPUC's guidelines approving PSPS events, particularly since Plaintiff did not allege that PG&E

25   carried out its PSPS events unreasonably or in contravention of CPUC guidelines.  (AA1254-55;

26   AA1262.)  The bankruptcy court also ruled that Plaintiff's Complaint failed to adequately allege

27   causation.  (AA1263.)  Following dismissal of the action, Plaintiff filed this appeal.

28

**V.    THE BANKRUPTCY COURT'S ORDER DISMISSING THE COMPLAINT SHOULD BE AFFIRMED**

    **A.    The Bankruptcy Court Properly Ruled That PUC § 1759 Preempts Plaintiff's Complaint**

The bankruptcy court dismissed Plaintiff's Complaint on the grounds that it is preempted by PUC § 1759, finding that the action "usurp[s] and interfer[es] with the CPUC's authority in approving [] PSPS events" and "any claim for damages caused by PSPS events approved by the CPUC, even if based on [] pre-existing events that may or may not have contributed to the necessity of the PSPS events, would interfere with the CPUC's policy-making decisions". (AA1255; AA1263.) The bankruptcy court got it right.

    **1.    Under California Supreme Court Precedent, PUC § 1759 Preempts Civil Actions That Seek Damages for Actions Authorized by the CPUC**

PUC § 2106 and PUC § 1759 govern civil actions for conduct the CPUC regulates. PUC § 2106, the statute Plaintiff invokes, permits civil courts to hear actions and award damages arising from a utility's violation of CPUC regulations and standards:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom.

PUC § 2106.

PUC § 1759(a), on the other hand, divests trial courts of subject matter jurisdiction over actions that would reverse or annul a specific CPUC order, or those that "would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy". *San Diego Gas & Elec. Co. v. Superior Court (Covalt)*, 13 Cal. 4th 893, 918 (1996). PUC § 1759 provides:

> No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court.

PUC § 1759.

1    Critically, the California Supreme Court has recognized that a potential conflict exists

2    between PUC §§ 1759 and 2106 when a plaintiff attempts to bring a suit seeking damages for a utility's

3    violation of CPUC regulations and standards that, if the plaintiff were to prevail, would hinder or

4    frustrate the commission's supervisory or regulatory policies. *Covalt*, 13 Cal. 4th at 917-18. In the

5    event of such conflicts, the California Supreme Court has unequivocally held that § 2106 must give

6    way to and be limited by § 1759: "In order to resolve the potential conflict between sections 1759 and

7    2106, the latter section must be construed as limited to those situations in which an award of damages

8    would not hinder or frustrate the commission's declared supervisory and regulatory policies." *Id.* This

9    result is consistent with prior holdings of the California Supreme Court, "declar[ing] the primacy of

10   section 1759 and the correspondingly limited role of section 2106". *Id.* at 917.

11    In determining whether PUC § 1759 applies, courts apply a three-part test articulated

12   in *Covalt*.[4] Specifically, a trial court does not have jurisdiction over a civil action where: (1) the

13   CPUC has the authority to regulate the conduct at issue; (2) the CPUC has exercised that authority;

14   and (3) the action would hinder or interfere with CPUC policies. *Covalt*, 13 Cal. 4th at 923, 926, 935;

15   *see also Rosen v. Uber Techs. Inc.*, 164 F. Supp. 3d 1165, 1174, 1177 (N.D. Cal. 2016). Plaintiff

16   concedes the first two prongs of the *Covalt* test are met. (App. Br. at 22 ("Plaintiff does not dispute

17   that the first and second parts of the *Covalt* test are satisfied".).) Thus, the only *Covalt* factor in dispute

18   is whether Plaintiff's action hinders or interferes with CPUC policies.[5]

19

20   _____

21   [4] Federal courts have held, and Plaintiff does not dispute, that § 1759 deprives federal courts of
jurisdiction over state law claims that interfere with the CPUC's regulatory authority. Federal courts
22   have applied *Covalt* to make this determination. *See Rosen v. Uber Techs. Inc.*, 164 F. Supp. 3d 1165,
1174, 1177 (N.D. Cal. 2016) (holding § 1759 barred tort claims because judicial intervention would
23   interfere with the CPUC's ongoing regulatory authority); *Cooney v. Cal. Pub. Utils. Comm'n*,
No. C 12-6466 CW, 2014 WL 3531270, at *3 (N.D. Cal. July 15, 2014) (dismissing state law claims
24   under § 1759 "where the relief granted would undermine a regulatory regime established by the
CPUC").
25

26   [5] Plaintiff's assertion that the bankruptcy court "failed to apply the *Covalt* test *at all*, which resulted
in the court's incorrect conclusion" is puzzling. (App. Br. at 23.) The bankruptcy court clearly
27   identified *Covalt* as the relevant test for analyzing PUC § 1759 and considered both parties' arguments
regarding the extent to which Plaintiff's action interferes with the CPUC's regulation of PSPS events
28   under the third prong of the *Covalt* test. (*See* AA1260-63.)

The California Supreme Court has made clear that any attempt to impose liability for utility conduct that the CPUC has authorized constitutes hindrance and interference.  For example, in *Covalt*, the plaintiffs sought damages from defendant relating to electric and magnetic fields emanating from power lines that ran close to plaintiffs' residence, which plaintiff claimed emitted high and unreasonably dangerous levels of electromagnetic radiation that the utility had failed to mitigate. At the time, "the question whether powerline electric and magnetic fields pose a danger to health had become a matter of some public concern and a source of growing controversy in the scientific community". *Covalt*, 13 Cal. 4th at 908.  The CPUC, after conducting investigations into the health effects of electrical magnetic fields, concluded that regulated utilities did not need to take action to reduce field levels from existing powerlines. *Id.* at 926-35.  The court held that plaintiffs' nuisance claim was thus preempted because it sought to impose civil liability for conduct that the CPUC had authorized, namely not mitigating radiation from existing powerlines. *Id.* at 939 (stating that plaintiffs' claims "would be inconsistent with the commission's conclusion . . . that the available evidence does not support a reasonable belief that 60 Hz electric and magnetic fields present a substantial risk of physical harm, and that unless and until the evidence supports such a belief, regulated utilities need take no action to reduce field levels from existing powerlines").

Later, in *Hartwell Corp. v. Superior Court*, 27 Cal. 4th 256 (2002), the California Supreme Court reinforced the conclusion that civil liability may not be imposed on a utility for CPUC-authorized conduct.  There, plaintiffs claimed that the defendant utilities negligently provided unsafe drinking water. *Id.* at 260-62. The court held that, notwithstanding the negligence allegations, where the utility provided water that met the CPUC's water quality thresholds, PUC § 1759 preempted the action. *Id.* at 276 ("An award of damages on the theory that the public utilities provided unhealthy water, even if that water actually met DHS and PUC standards, would interfere with a 'broad and continuing supervisory or regulatory program' of the PUC." (quoting *Covalt*, 13 Cal. 4th at 919)).  In effect, the CPUC had authorized a level of contamination in drinking water given that the costs of further remediation would outweigh the benefits. *Id.*  At the same time, the court also held that plaintiffs' claims for damages arising from the utilities' alleged *exceedances* of the CPUC's water-quality thresholds were *not* preempted under PUC § 1759. *Id.*  The CPUC had not authorized

utilities to distribute water with contamination at those levels, and therefore civil liability for those claims would assist in enforcing the CPUC's regulations, rather than interfere. *Id.* at 277. Since then, other courts have enforced this distinction. *See, e.g.*, *Cooney v. Cal. Pub. Utils. Comm'n*, No. C 12-6466 CW, 2014 WL 3531270, at *3 (N.D. Cal. July 15, 2014) (holding action was preempted where plaintiff claimed harm caused by equipment that the CPUC authorized utilities to use); *Sarale v. Pac. Gas & Elec. Co.*, 189 Cal. App. 4th 225, 242-43 (2010) (holding action preempted where plaintiffs sought damages from utility's compliance with CPUC regulation to exercise discretion to clear trees and vegetation beyond minimum legal clearances as required by conditions).

### 2. Because Plaintiff's Claim Seeks to Impose Civil Liability on PG&E for CPUC-Authorized Conduct, It Would Interfere With the CPUC's Regulation of PSPSs

The current action is on all fours with the California Supreme Court's holdings in *Covalt* and *Hartwell*. Plaintiff's action interferes with the CPUC's authority because it seeks to impose liability for PSPS events authorized by the CPUC, thereby undermining the CPUC's carefully considered policy decision on whether and how to authorize PSPS events. Plaintiff does not allege that particular PSPS events were carried out in a manner that violated CPUC guidelines. (*See* AA1002.) Instead, Plaintiff seeks to impose liability for *all* PSPS events carried out by PG&E.

The CPUC authorized PG&E's PSPS events after extensive and ongoing investigations into the need for power shutoffs for the sake of public safety. Through its 2012 SDG&E Decision and ESRB-8, the CPUC authorized PG&E and other utilities in the state to shut off power under certain extreme weather conditions to reduce the risk of wildfires. (*See* AA0162; AA0465-69.) In developing its PSPS guidelines and approving the PSPS programs of PG&E and other utilities, the CPUC has taken into account and balanced the competing interests and costs involved in these planned outages, including detriments to residents and businesses arising from the loss of income, food spoilage, temporary relocation, loss of productivity or habitability, and health and safety risks. (*See* AA0169-70; AA0108-10; AA0118-27.) And, the CPUC approved PG&E's 2019 PSPS program in PG&E's Wildfire Safety Plan. (*See* WSP at 97-98.)

Like in *Covalt* and *Hartwell*, Plaintiff seeks to hold PG&E responsible despite the fact that its conduct complied with the CPUC's policies. Such a result would greatly hinder the CPUC's

1  carefully considered authorization of PSPS events.  Indeed, if Plaintiff were to prevail in its effort to

2  impose billions of dollars of civil liability for PSPS events even when carried out in accordance with

3  CPUC rules, it would effectively gut the ability of utilities to use this essential public safety tool,

4  notwithstanding the CPUC's determination that PSPS has a role in protecting life and property.  That

5  is exactly the type of result that PUC § 1759 seeks to avoid.

6         The CPUC agrees.  It has expressly stated that allowing this action to proceed would

7  interfere with its authority.  In its *amicus* brief filed with the bankruptcy court, the CPUC stated that

8  the policies reflected in ESRB-8 and the CPUC's approval of PG&E's Wildfire Safety Plan "expressly

9  authorize the Utility to decide that a public safety power shutoff is warranted under certain

10 circumstances." (AA1128.)  Because Plaintiff "seeks to impose liability on the Utility for exactly such

11 decisions, without alleging that any particular decision by the Utility to conduct a public safety power

12 shutoff violated the Commission's policies concerning such shutoffs, and without alleging that any

13 particular decision by the Utility to conduct a public safety power shutoff resulted from the Utility's

14 underlying failure to comply with any particular mandate", judicial adoption of Plaintiff's theory

15 "would hinder or interfere with the Commission's considered policy to allow utilities to conduct public

16 safety power shutoffs in the interests of public safety pursuant to guidelines established by the

17 Commission." (AA1128-29.)

18        Although the CPUC's view is not dispositive, the opinion of the key regulator at issue

19 is important and should be afforded significant weight.  As the Ninth Circuit recognized, "California

20 courts have made reference to the PUC's amicus briefs filed in § 1759 cases for aid in assessing the

21 third question in the *Covalt* analysis", and it noted that the California Supreme Court has encouraged

22 courts where appropriate "to solicit the views of the [CPUC] regarding whether the action is likely to

23 interfere with the [CPUC's] performance of its duties".  *Kairy v. SuperShuttle Int'l*, 660 F.3d 1146,

24 1154 (9th Cir. 2011) (citation omitted).  Indeed, before the CPUC filed its brief, Plaintiff repeatedly

25 highlighted the probative value of a statement by the CPUC.  (AA1002 ("Significantly, the CPUC

26 itself has not indicated in any way that this action would interfere with its regulatory authority.").)

27 Plaintiff changed his opinion of the significance of the CPUC's view only after the CPUC expressed

28 the view that his action should be barred.

---

APPELLEES' OPPOSITION BRIEF                                                        13
CASE NO. 4:20-CV-02584 (HSG)

3.      **There Is No Merit to Plaintiff's Argument That This Action Is Not Preempted Because It Acts in Aid of CPUC Policies**

Plaintiff argues that because the Complaint alleges that the 2019 PSPS Events were "necessitated" by PG&E's poor maintenance of its equipment, the action aids in the enforcement of CPUC standards pursuant to PUC § 2106 and is not preempted. (App. Br. at 8, 27.) But it is not enough for Plaintiff to state a claim under PUC § 2106 alone. The California Supreme Court has been clear that PUC § 2106 is limited by PUC § 1759. *Covalt*, 13 Cal 4th at 917-18. Therefore, a suit survives preemption only if it "would not hinder or frustrate the commission's declared supervisory and regulatory policies". *Waters v. Pac. Tel. Co.*, 12 Cal. 3d 1, 4 (1974). Here, Plaintiff's claimed damages arise directly from PG&E's PSPS events, which the CPUC authorized. Because an award of damages would interfere with the CPUC's regulation of PSPS events, PUC § 1759 preempts the suit, regardless of whether it would otherwise be allowed under § 2106.

To support his argument, Plaintiff cites a number of decisions that dealt with whether suits seeking damages arising directly from alleged violations of CPUC requirements should survive, absent any other interference with the CPUC's authority. (*See* App. Br. at 27-28.) Those cases are inapposite. Unlike here where Plaintiff wants to recover for damages arising from PG&E's PSPS events that the CPUC authorized, the cases Plaintiff cites involve damages arising from an alleged failure by the utility to comply with CPUC standards. For example, in *PegaStaff v. Pacific Gas & Electric Co.*, 239 Cal. App. 4th 1303, 1311-13 (2015), plaintiffs claimed they suffered harm because of a program that gave preferential treatment to minority enterprises. In that case, the court held that the program in question was *prohibited* by the CPUC because "utilities are not authorized or permitted to give preferential treatment to minority enterprises" and "[t]here can be no doubt that the tier system as described in PegaStaff's [complaint] is a preferential system". *Id.* at 1326. Similarly, in *North Star Gas Co. v. Pacific Gas & Electric Co.*, 2016 WL 5358590, at *13 (N.D. Cal. Sept. 26, 2016), the court held that an action seeking damages from defendant was not preempted by PUC § 1759 because the "gravamen of Plaintiff's claims" was that defendant violated Gas Rule 23. Accordingly, a finding of liability would not interfere with CPUC policies or conduct authorized by the CPUC.

Here, in contrast, Plaintiff does not dispute that the CPUC has authorized the adoption and implementation of PSPS events by PG&E, nor does Plaintiff dispute that PG&E has complied with the CPUC's regulation of the PSPS events.  (*See* App. Br. at 11.)  A finding of liability in this action would impose liability—massive liability—on conduct that *complies* with the CPUC's PSPS policies.  Accordingly, it would interfere with the CPUC's ability to regulate this important area of public safety.

Nor is Plaintiff aided by citing cases where a defendant met a CPUC minimum standard, but was alleged not to have gone far enough.  In *Mata v. Pacific Gas & Electric Co.*, 224 Cal. App. 4th 309, 316-17 (2014), plaintiff sought damages for an alleged failure to exercise reasonable care in determining what amount of tree trimming beyond the CPUC's minimum requirements was safe in a particular case.  The court there found that there was no interference with CPUC authority because the applicable CPUC regulations, while setting *minimum* clearances, also required more to be done if it was required under specific circumstances.  *Id.* at 318.  Thus, the court found that Plaintiffs were seeking to impose liability for conduct that, if proven true, would have run afoul of CPUC regulations.  *Id.* at 320.  *Wilson v. Southern California Edison Co.*, 234 Cal. App. 4th 123, 151 (2015) is likewise inapposite because the court found that while the defendant had met certain minimum CPUC standards, those standards did not relate to and the CPUC did not regulate, much less authorize, the conduct that led to the plaintiff's harm (stray voltage).  Here, it is undisputed that the CPUC is actively and vigorously regulating when and how utilities may engage in PSPS events.

The remaining cases Plaintiff cites involve situations where a finding of liability would clearly not be contrary to any policy adopted by the CPUC or otherwise interfere with the CPUC's regulation of utilities.  In *Cundiff v. GTE California Inc.*, 101 Cal. App. 4th 1395, 1406 (2002), for example, the court found that the action was not preempted because plaintiffs were "not challenging [the CPUC's] decision to allow defendants to rent telephones to their customers" but were only "challenging the *manner* in which defendants billed them" under those regulations.  Here, Plaintiff does the opposite.  He does not challenge the manner in which PG&E carried out its PSPS events but instead seeks to impose liability for every PSPS event by PG&E in 2019 and beyond, despite

compliance with CPUC standards. (*See* AA0031 ("Plaintiff seeks damages arising from several power shutoffs in 2019 and any in future years conducted pursuant to PG&E's Wildfire Safety Plan.").) Thus, liability would clearly conflict with the CPUC's policy decision to approve this precautionary measure. *Kairy* is also inapposite because it did not involve any conduct authorized by the CPUC. 660 F.3d at 1154-56.

### 4. Whether the CPUC Has the Ability to Award Compensatory Damages Does Not Control the Preemption Analysis

Plaintiff argues that the fact that the CPUC does not have the authority to award tort damages "alone means that the bankruptcy court erred in finding § 1759 preemption". (App. Br. at 32.) That assertion is simply wrong. Whether the CPUC has authority to award the relief requested is not determinative of whether an action is preempted. The inquiry is whether "an award of damages would . . . have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy". *Covalt*, 13 Cal. 4th at 918.[6]

Plaintiff's argument is directly contrary to California Supreme Court authority. Where, as here, awarding damages would impose liability for conduct the CPUC has authorized, courts have found that the action interferes with the CPUC's policies and is preempted. *See Hartwell*, 27 Cal. 4th at 276 ("[a]n award of damages on the theory that the public utilities provided unhealthy water, even if the water met [regulator's] standard, 'would plainly undermine the commission's policy'" and "such damages actions are barred"); *Covalt*, 13 Cal. 4th at 903; *see also Cooney*, 2014 WL 3531270, at *3 (holding that an action was preempted where plaintiff claimed damages for harm caused by equipment that CPUC authorized utilities to use).

Plaintiff's attempt to liken his action to the litigation arising from the 2017 and 2018 Wildfires is equally misplaced. As the bankruptcy court correctly concluded, plaintiffs in those suits

---

[6] In support of this erroneous argument, Plaintiff again relies solely on cases where damages arose from the defendants' alleged violations of CPUC regulations and there was no concern over conduct that actually *was* authorized by the CPUC, making them inapplicable to the current case. *PegaStaff*, 239 Cal. App. 4th at 1326; *Mangiaracina v. BNSF Ry. Co.*, No. 16-cv-06270-JST, 2019 WL 1975461, at *14 (N.D. Cal. Mar. 7, 2019).

suffered damages that arose directly from PG&E's alleged violations of the CPUC's equipment maintenance and vegetation management regulations; there were no allegations concerning PG&E's implementation of a program that *was* authorized and approved by the CPUC to prompt the application of PUC § 1759.  (AA1263 n.2.)

## B.    The Bankruptcy Court Correctly Found That the Complaint Failed to Allege Causation

As the bankruptcy court correctly found, Plaintiff also fails to allege a claim because "the proximate causal connection between the harms suffered by Plaintiff during the blackouts (loss of habitability of his dwelling, loss of cell phone connectivity) and the conditions pre-dating those blackouts is too remote to defeat the MTD".  (AA1263.)   As a result, the Complaint should be dismissed under Rule 12(b)(6).

### 1.    The Complaint Fails to Adequately Allege Causation

A complaint is subject to dismissal under Rule 12(b)(6) where Plaintiff fails to plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). Under California law, in order for a negligence claim to proceed, a defendant's breach of his duty of care must be both the actual cause and the proximate cause of the plaintiff's injury.  *Novak v. Cont'l Tire N. Am.*, 22 Cal. App. 5th 189, 196-97 (2018).  In order to meet this test, the alleged negligence must be a substantial factor in causing the injury and "there must be some reasonable connection between the original negligence and its consequences, between the harm threatened and the harm done".  *Id.* at 197 (citation omitted).

The damages Plaintiff seeks are for losses that flowed directly from the 2019 PSPS Events, such as loss of habitability of his dwelling during the blackouts and loss of cell phone connectivity.  (AA0002; AA0017-18; AA0021-22.)  But Plaintiff does not allege that his losses were caused by PG&E's failure to use reasonable diligence in initiating and executing these events. (AA1002 ("The Complaint does not allege that the PSPSs were not necessary and appropriate, or that the CPUC's approval of its Wildfire Safety Plan was improper, only that the PSPSs would not have been necessary in the first place had PG&E not been negligent.").)  Instead, Plaintiff alleges that

1   (1) PG&E failed to reasonably maintain its electric equipment, and (2) that failure "necessitated" the

2   2019 PSPS Events, however reasonably those events were initiated and executed.

3      The Complaint fails because it contains no specific factual allegations connecting

4   PG&E's alleged negligence to the scope of the different PSPS events that PG&E implemented in

5   2019—as it must in order to properly make out a claim under Plaintiff's theory.  The sum total of the

6   allegations purporting to connect PG&E's past negligence to the PSPS events are excerpted below:

7     &bull; PG&E's failure to conduct proper and regular inspections of its equipment and failure
        to make necessary repairs contributed to the cause of the deadly wildfires in
8      California and were the reason [for the] Outages in the fall of 2019.  (AA0009 at
        ¶ 41.)

9     &bull; PG&E's failure to treat its aging infrastructure as an enterprise-level risk in a
        reasonable manner contributed to PG&E being unable to trust that its aging
10     equipment would not create or exacerbate ongoing wildfires in Northern California
        and caused it to cut power to millions of its customers for days at a time.  (AA0010 at
11     ¶ 45.)

12    &bull; PG&E's failure to address this "run to failure" approach to maintenance contributed
        to the wildfires that have plagued California and caused it to shut off power to its
13     customers rather than risk another corporate-negligence-induced disaster.  (AA0011
        at ¶ 48.)
14

15  Such conclusory statements are not enough.  *Iqbal*, 556 U.S. at 677-78 (plaintiff's allegations must be

16  supported by "sufficient factual matter" to state a plausible claim and "mere conclusory statements"

17  are not credited).

18     Notably, the Complaint comes nowhere close to alleging that the specific circuits that

19  affected Plaintiff (or any individual in the putative class) were de-energized because of maintenance

20  concerns.  Under PG&E's Wildfire Safety Plan, electric lines are not subject to de-energization on a

21  state-wide basis.  Instead, de-energization is conducted on a circuit-by-circuit or line-by-line basis (*see*

22  WSP at 94-98), and the PSPS events at issue involved hundreds of different circuits and lines.  The

23  question of whether an allegedly negligent failure to maintain a particular facility in the past caused a

24  particular circuit or line to be de-energized in 2019 is necessarily specific to the line and plaintiff in

25  question, and no attempt has been made to establish such a link.

26     Plaintiff's conclusory allegations also fail because it is undisputed that the legislature,

27  through Senate Bill 901, required all utilities across the state to develop protocols for de-energization

28  regardless of their maintenance history, and the CPUC authorized PSPSs state-wide across all utilities

1    to combat the threat of extreme fire conditions.  As the bankruptcy court put it, "PSPS events can be
2    necessitated by high winds even when equipment is adequately maintained".  (AA1243.)

3                      On appeal, Plaintiff argues that because the Complaint alleges that (a) PG&E's
4    equipment is required to withstand 92 mile per hour winds and (b) winds did not approach those speeds
5    on certain dates, the PSPS events on those dates must have been initiated because of PG&E's
6    negligence.  (App. Br. at 34.)  But those allegations fail to establish the necessary link between the
7    alleged negligence and PSPS events.  Design limits for equipment do not speak at all to the risk of
8    wind causing vegetation to strike a line.  Moreover, the CPUC has rejected the notion of limiting PSPS
9    events to only when wind speeds reach the design limit for a line.  For example, in authorizing
10   SDG&E's PSPS program in 2012, the CPUC specifically declined to adopt a proposal prohibiting
11   SDG&E from shutting off power at below design limits, recognizing that it would be "extremely
12   dangerous" not to authorize PSPS events at below the design limits if conditions otherwise warranted
13   de-energization.  (AA0194.)

14                     Plaintiff's references to statements made by Judge Alsup in connection with an order
15   regarding PG&E's probation arising from the 2010 San Bruno Gas Explosion also fail to save the
16   Complaint.  In April, Judge Alsup, who oversees PG&E's probation proceedings arising from the 2010
17   San Bruno Gas Explosion, released an order modifying PG&E's conditions of probation.  (AA1271.)
18   The statements made by Judge Alsup are not pled or referenced in the Complaint—the Complaint was
19   dismissed by the bankruptcy court almost a month before Judge Alsup issued his probation order.[7]
20   These statements should therefore not be considered in analyzing whether the Complaint states a
21   claim.  *See In re Turbodyne Techs., Inc. Sec. Litig.*, No. CV9900697MMMBQRX, 2000 WL
22   33961193, at *10 (C.D. Cal. Mar. 15, 2000) ("In deciding a motion to dismiss, courts may not 'take
23   into account additional facts asserted in a memorandum opposing the motion to dismiss, because such
24   memoranda do not constitute pleadings under Rule 7(a).'" (quoting *Schneider v. Cal. Dep't of Corr.*,
25   151 F.3d 1194, 1197 n.1 (9th Cir. 1998))); *see also Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50

26
27   [7] Judge Alsup subsequently granted leave to seek reconsideration of his April 29, 2020 order, and the
     parties to the probation proceeding have submitted supplemental briefing.  Proceedings concerning
28   the order remain pending.

APPELLEES' OPPOSITION BRIEF                                                                              19
CASE NO. 4:20-CV-02584 (HSG)

1    F. Supp. 3d 1328, 1350 (C.D. Cal. 2014) ("Plaintiffs cannot utilize the documents [not contained in

2    the complaint] to amend the complaint and defeat defendants' motions to dismiss.").

3                    Nor do Judge Alsup's statements fill Plaintiff's causation gap.  As part of the probation

4    order, Judge Alsup included a discussion of the vegetation that had fallen into PG&E's powerlines

5    during the 2019 PSPS events, which he stated "remain proof positive that the PSPS program saved

6    lives and homes".  (AA1276.)  "Shutting off the power in those lines in advance of the windstorms",

7    Judge Alsup said, "was essential to public safety".  (*Id.*)  Judge Alsup went on to say that "[a]t the

8    same time, those hundreds of fallen limbs and trees also remain proof positive of how unsafe PG&E

9    had allowed its maintenance backlog to become." (*Id.*)  While PG&E respectfully disagrees with

10   drawing that conclusion from the number of limbs and trees that fell during the windstorms, the

11   relevant point for present purposes is that Judge Alsup did not address in the probation order how the

12   2019 PSPS Events were scoped by PG&E under its CPUC-approved policies, or whether, pursuant to

13   that scope, the 2019 PSPS Events that caused Plaintiff's alleged injuries were triggered by the

14   maintenance issues alleged in the Complaint.  That is the Complaint's missing link.[8]

15          **2.      The Bankruptcy Court Did Not Err by Considering the Failure to Plead**

16          **Causation**

17                    Plaintiff argues that it was legal error for the bankruptcy court to address causation

18   because it was raised for the first time in PG&E's reply brief.  (App. Br. at 35-36.)  Plaintiff is wrong.

19                    The causation issue was properly before the bankruptcy court because Plaintiff clarified

20   for the first time in his opposition brief that he was not arguing that negligence in carrying out the

21

22   _____

     [8] Plaintiff's effort to fill in the Complaint by citing to a post-PSPS event report that PG&E filed with
23   the CPUC in November 2019 is also unpersuasive.  (App. Br. at 2.)  That document discusses the
     scoping of an event covering distribution circuits and transmission lines based on weather.  It notes
24   that within-scope transmission lines (but not distribution circuits) were further assessed based on the
     number of affected downstream customers and a wildfire risk assessment of the line.  It does not say
25   or suggest that PG&E transmission lines were de-energized because they were non-complaint with
     regulations or improperly maintained.  Lines, including well-maintained lines, may present different
26   risks based on factors such as proximity to population centers, age, design standards, maintenance tags
     that are in the process of being worked, and the surrounding environment and vegetation.  That does
27   not link Plaintiff's allegations of past negligence—most of which come from reports published in 2010
     and 2013 (*see, e.g.*, AA0007-09 at ¶¶ 27, 29, 40)—to the 2019 PSPS events.
28

PSPS caused the alleged injuries.  *See, e.g.*, *Shriners v. United States*, No. 14-CV-1437 AJB (KSC), 2017 WL 3412299, at *5 n.6 (S.D. Cal. Aug. 8, 2017) ("the Court may properly consider evidence and arguments submitted with a reply that is responsive to points raised in the non-moving party's opposition"); (*see also* AA1146).

After it was raised in PG&E's reply brief, Plaintiff had a full opportunity to address this argument before the bankruptcy court issued its order.  Plaintiff filed a motion to strike the causation argument (AA1130), and filed a response to the CPUC's amicus brief that attempted to rebut PG&E's causation argument (AA1148).  The bankruptcy court also held extensive argument on the motion to dismiss, including on the issue of causation.  (AA1207-08 at 29:3-31:25; AA1211-13 at 33:16-35:14); *see El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040-41 (9th Cir. 2003) (court may consider new issues raised in reply if it gives the opposition an opportunity to respond); *Sanchez v. Cty. of San Bernardino*, No. CV 10-09384 MMM (OPx), 2014 WL 12734756, at *5 (C.D. Cal. Mar. 10, 2014) (same).

## C.   The Bankruptcy Court Order Should Be Affirmed on the Alternative Ground That PG&E's Tariff Rule 14 Allows It to Shut Off Power for Public Safety Without Liability to Customers

This Court may affirm the bankruptcy court's motion to dismiss "on any ground supported in the record", whether or not the bankruptcy court expressly considered the ground.  *In re Gens*, No. 15-BK-53562, 2018 WL 4353086, at *11 n.5 (N.D. Cal. Sept. 12, 2018) ("a dismissal for failure to state a claim under Rule 12(b)(6) may be affirmed on any ground supported by the record"); *see also In re Jones*, 657 F.3d 921, 924 (9th Cir. 2011) (holding that "we may affirm on any ground supported by the record" and that, "[a]lthough we affirm the BAP's result, we rely on different grounds").  The Complaint is subject to dismissal for failure to state a claim under Rule 12(b)(6) on the alternative ground that PG&E's Tariff provides that PG&E may in its "sole opinion" cut off power for the purpose of public safety without liability to customers.  (AA0938.)

It is undisputed that Plaintiff and the members of the putative class are PG&E customers.  (AA0018 at ¶ 85 (defining the proposed class as "[a]ll California residents and business owners who had their power shutoff by PG&E during the . . . Outages and any subsequent voluntary

1  Outages PG&E imposes on its customers during the course of litigation").)  And it is undisputed that

2  PG&E's obligations to its customers are governed by its tariff rules.  (App. Br. at 38-39.)  Utility tariffs

3  are filed with and reviewed by the CPUC and "have the force and effect of law".  *Dollar-A-Day Rent-*

4  *A-Car Sys. v. Pac. Tel. & Tel. Co.*, 26 Cal. App. 3d 454, 457 (1972); *see also Dyke Water Co. v. Pub.*

5  *Utils. Comm'n*, 56 Cal. 2d 105, 107 (1961) (noting that, when a tariff rule is published and filed with

6  the CPUC, it has "the force and effect of a statute, and any deviations therefrom are unlawful unless

7  authorized by the commission"); *Duggal v. G.E. Capital Commc'ns Servs.*, 81 Cal. App. 4th 81, 82

8  (2000) ("filed tariffs are the equivalent of federal regulations which have the force of law"); (App. Br.

9  at 38 n.9 (acknowledging that "[i]f approved by the CPUC [tariffs] have the effect of law")).

10  PG&E's Tariff Rule 14 governs "[s]hortage of supply and interruption of delivery",

11  and provides that "PG&E will exercise reasonable diligence and care to furnish and deliver a

12  continuous and sufficient supply of electric energy to the customer, but does not guarantee continuity

13  or sufficiency of supply."  (AA0938.)  It then has provisions dealing with more specific situations,

14  including paragraph 4, which states that PG&E may interrupt service without liability to its customers

15  when "in PG&E's sole opinion" an interruption is necessary for public safety:

16          PG&E specifically maintains the right to interrupt its service
           deliveries, without liability to the Customers or electric service
17          providers (ESPs) affected, when, in PG&E's sole opinion, such
           interruption is necessary for reasons including, but not limited to, the
18          following:
           1.      Safety of a customer, a PG&E employee, or the public at
19          large . . . .

20  (AA0938.)

21          A plain reading of PG&E's Tariff Rule 14 provides that the decision to shut off a

22  customer's power cannot trigger liability to the customer when in PG&E's sole opinion it is necessary

23  for public safety.  Tariff Rule 14 applies to the PSPS events that are the subject of the Complaint

24  because they are undisputedly "service interruptions" caused by PG&E's determination that they were

25  necessary for the safety of the public-at-large.  (*See* AA1015 n.6 ("the Complaint does not dispute that

26  PG&E's PSPSs were necessary for safety purposes").)

27          Plaintiff argues—contrary to Rule 14's clear text—that Tariff Rule 14 does not govern

28  liability for PSPS events because it was approved prior to the creation of the PSPS program and is thus

wholly unrelated to the PSPS events. (App. Br. at 38.) But the fact that the Tariff predates PG&E's PSPS policy does not nullify its plain text meaning. PSPS events are service interruptions for the purpose of public safety and thus squarely fall in the purview of Rule 14. Indeed, in a case brought by a customer for damages arising from a power outage, a California court granted summary judgment in PG&E's favor based on a plain reading of the language of paragraph 4 of Tariff Rule 14. *See Cockhren v. Pac. Gas & Elec. Co.*, No. CGC-13-529137, 2014 WL 5601354, at *1 (Cal. Super. Ct. Oct. 7, 2014).[9]

Below, Plaintiff argued that comments made by the CPUC in relation to its denial of SDG&E's request to add similar language to SDG&E's Tariff in connection with its PSPS program means that Tariff Rule 14 does not apply to PSPS. (AA1016-17.) In that decision, the CPUC noted that PG&E's Tariff Rule 14 was not approved in connection with any PSPS application by PG&E, and therefore it did not constitute a "reasonable precedent" for approving the adoption of similar language by SDG&E in connection with SDG&E's PSPS program. The CPUC's statement, however, does not mean that PG&E's tariff, as written and in force today, does not apply to interruptions of service for public safety under the umbrella of a PSPS event. (AA1114.) It squarely does. Indeed, the entire premise of SDG&E's request—which the CPUC did not quarrel with—was that a plain reading of PG&E's tariff would operate to bar the very type of claim that Plaintiff has asserted here. (*Id.*) To the extent Plaintiff seeks changes in the tariff rules in light of PSPSs, the CPUC is the right forum for that effort.

Plaintiff also argues that PG&E's reading of Rule 14 is inconsistent with the holding of *Tesoro Refining & Marketing Co. v. Pacific Gas & Electric Co.*, 146 F. Supp. 3d 1170 (N.D. Cal. 2015). (App. Br. at 39.) But that case, which dealt with a different section of Rule 14, is inapposite. In *Tesoro*, the court was asked to determine whether certain language in paragraph 3 of Tariff Rule 14—"PG&E shall not be liable to any customer, or electric service provider, for damages or

---

[9] Below, Plaintiff argued that the bankruptcy court was not permitted to rely on this case because it was unpublished. (AA1015.) But Plaintiff did not seriously dispute the basis of the court's decision. (AA1015 at n.6 ("That summary judgment decision was based on PG&E submitting unrefuted evidence that it shut power off for public safety purposes.").)

1    losses resulting from interruption due to transmission constraint, allocation of transmission or intertie
2    capacity, or other transmission related outage"—meant that PG&E was exempt from liability for all
3    "outages related to transmission", even when the outage was caused by PG&E's failure to exercise
4    reasonable diligence.  146 F. Supp. 3d at 1179.  The court held that the language in paragraph 3 did
5    not "absolve" PG&E of liability for its own negligent operation or maintenance of its transmission
6    systems.  *Id.* at 1187.  That holding largely rested on reading the clause "or other transmission related
7    outage" to mean outages caused by factors outside of PG&E's control.  Indeed, all of the examples
8    provided by the Rule address matters outside of PG&E's control:  "interruption due to transmission
9    constraint, allocation of transmission or intertie capacity".  *Id.* at 1185 ("The broad reading that PG&E
10   proposes . . . is incongruent in comparison to the more specific limitations of liability discussed
11   above").  That analysis does not apply to paragraph 4, which focuses narrowly on power outages which
12   in PG&E's sole opinion are necessary for the safety of an employee, a customer or the public.[10]

13       **D.    The Bankruptcy Court Did Not Abuse Its Discretion by Not Granting Plaintiff**
14             **Leave to Amend the Complaint**

15             A lower court's dismissal of a case without leave to amend is reviewed for abuse of
16   discretion.  *In re Tracht Gut, LLC*, 503 B.R. 804, 810 (B.A.P. 9th Cir. 2014).  A court does not abuse
17   its discretion by denying a plaintiff leave to amend where "amendment would be futile".  *AE ex rel.*
18   *Hernandez v. Cty. of Tulare*, 666 F.3d 631, 634 (9th Cir. 2012).

19             Here, the bankruptcy court properly dismissed Plaintiff's Complaint without leave to
20   amend because Plaintiff can allege no set of facts that would cure the lack of subject matter
21   jurisdiction.  To support his request for leave to amend, Plaintiff argues that he can formulate more

22   _____
23   [10] Plaintiff states that the bankruptcy court's failure to address PG&E's Tariff Rule 14 argument means
     that the bankruptcy "properly rejected" that argument.  (App. Br. at 38.)  That is wrong.  The
24   bankruptcy court did not reach this issue because it did not need to—it found it did not have subject
     matter jurisdiction over Plaintiff's action under Rule 12(b)(1) and dismissed the Complaint on those
25   grounds.  Indeed, courts in this Circuit do not hesitate to affirm decisions on alternative grounds that
     the lower court did not reach.  *See, e.g.*, *In re Jones*, 657 F.3d at 924 ("Although we affirm the BAP's
26   result, we rely on different grounds."); *In re Gens*, 2018 WL 4353086, at *11 (affirming a motion to
     dismiss on an alternative ground not addressed by the bankruptcy court and noting that "[t]he
27   Bankruptcy Court declined to reach the argument based on its conclusion that the FAC was subject to
     dismissal on other grounds").
28

APPELLEES' OPPOSITION BRIEF                                                                          24
CASE NO. 4:20-CV-02584 (HSG)

1   specific allegations that certain lines were de-energized because of poor prior maintenance.  (App. Br.

2   at 37 (stating that "[i]f more specific allegations concerning the PSPSs and the specific power lines is

3   what is needed [to overcome dismissal], Plaintiff should have been given the opportunity to allege

4   those facts").)  But such allegations could attempt to address only Plaintiff's causation gaps, they

5   would not change the preemption analysis, which was the bankruptcy court's primary grounds for

6   dismissal.  *See, e.g.*, *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 761-62

7   (9th Cir. 2014) ("Preemption is almost always a legal question, the resolution of which is rarely aided

8   by development of a more complete factual record." (citation omitted)).  Accordingly, the bankruptcy

9   court did not abuse its discretion by denying leave to amend.

10        Plaintiff says repeatedly that the "CPUC conceded that Plaintiff could amend to state a

11   claim that it believed would not be preempted".  (App. Br. at 37.)  That is not a fair reading of the

12   CPUC's statements.  During oral argument before the bankruptcy court, the bankruptcy court asked a

13   series of questions to both PG&E and the CPUC asking whether counsel agreed that "[i]f there was

14   some negligent conduct *in carrying out a PSPS*, there might be liability".  (*See, e.g.*, AA1195

15   (emphasis added)).  During these exchanges, counsel for the CPUC agreed there could be, but stated

16   it would depend on the allegations.  (AA1195-98.)

17        That is different than saying *this* Complaint could be saved by allegations tying poor

18   maintenance to specific circuits or lines that were de-energized.  The very core of Plaintiff's claim is

19   that civil liability should be imposed on PG&E for any past or future PSPS event, irrespective of

20   whether PG&E carries out a PSPS event properly.  (AA1002 ("The Complaint does not allege that the

21   PSPSs were not necessary and appropriate, or that CPUC's approval of its Wildfire Safety Plan was

22   improper, only that the PSPSs would not have been necessary in the first place had PG&E not been

23   negligent."); AA0018 at ¶ 85.)  Counsel for the CPUC was clear that this theory of liability is barred.

24   (AA1198-99 at 20:22-23:2 ("It's tied to the fact that it's seeking to impose liability for actions that the

25   Commission authorized and that are not alleged to have been in violation of a Commission rule or

26   order.  And so for those reasons, Your Honor, the Commission believes that Section 1759 bars

27   plaintiff's claims.").)

28

1           Accordingly, the bankruptcy court did not abuse its discretion by denying leave to

2 amend.

3 **VI.    CONCLUSION**

4           For these reasons set forth above, the bankruptcy court's order should be affirmed.

5

6 Dated:  July 6, 2020

7                            **WEIL, GOTSHAL & MANGES LLP**

8                            **CRAVATH, SWAINE & MOORE LLP**
                           **KELLER BENVENUTTI KIM LLP**

9                            /s/ *Omid H. Nasab*

10                            Omid H. Nasab

11

12                            *Attorneys for Debtor-Appellees (Debtors and*

13                            *Debtors in Possession)*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      "Pursuant to Local Rule 5-1(i)(3), I, Thomas B. Rupp, attest that concurrence in filing

2   this document has been obtained from the other signatories."

3

4                              KELLER BENVENUTTI KIM LLP

5                                 /s/ *Thomas B. Rupp*
                                  Thomas B. Rupp
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

3

4

5

        1.      This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 9,731 words.

6

7

8

9

        2.      This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) and Civil L.R. 3-4(c)(2) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.

10

11

12

13

**WEIL, GOTSHAL & MANGES LLP**
**CRAVATH, SWAINE & MOORE LLP**
**KELLER BENVENUTTI KIM LLP**

14

*/s/ Omid H. Nasab*
Omid H. Nasab

15

16

17

*Attorneys for Debtor-Appellees (Debtors and Debtors in Possession)*

18

19

20

21

22

23

24

25

26

27

28